## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| SUE PINSLY, | ) | |
| GARY PINSLY, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| HOLOGIC, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | JURY DEMAND |

## COMPLAINT

Plaintiffs Sue Pinsly and Gary Pinsly bring this product liability action against

Defendant Hologic, Inc. and state the following in support of their claims:

## PARTIES

1.     Plaintiffs Sue Pinsly and Gary Pinsly are married citizens of Tennessee.

They reside at 215 Hillwood Blvd., Nashville, Tennessee 37205.

2.     Defendant Hologic, Inc. ("Hologic") is headquartered in Marlborough,

Massachusetts which was, and is, engaged in the business of designing,

manufacturing, developing, preparing, processing, inspecting, testing, packaging,

promoting, marketing, distributing, labeling, or selling for profit, either directly or

indirectly, through an agent, affiliate, predecessor, or subsidiary, the BioZorb device.

Hologic is registered to do business in, and routinely does business through

employees, contractors, and agents, and enjoys protection of the laws of both Massachusetts and Arkansas.

## JURISDICTION

3.      Jurisdiction and Venue are proper in this Court pursuant to 28 U.S.C. §§ 101, 1391, 1441(a), because (1) Defendant resides in this judicial district; and (2) a substantial part of the events or omissions giving rise to the claim occurred in this district. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because (1) there is complete diversity of citizenship between Plaintiff and Defendant; and (2) the amount in controversy exceeds $75,000, exclusive of interests and costs.

## FACTS

4.      Following breast-conserving surgery, the Plaintiff Sue Pinsly ("Plaintiff") was implantated with a BioZorb Marker, manufactured by Hologic, in her left breast.

5.      The BioZorb implant never fully absorbed. It remained painful, partially shifted, and visibly protruding from under Plaintiff's left armpit. For three years, it stuck out, interfering with Plaintiff's mobility, sleep, and intimate relations.

6.      Plaintiff has suffered ongoing pain, emotional distress, loss of physical function, and permanent scarring. Plaintiff has not undergone removal surgery due to the known risks of complications or infection. She has been emotionally and physically affected for years, impairing her sleep, ability to exercise, and daily functioning. Her injury has impacted not just her own life, but the lives of her family members as well.

7.    Gary Pinsly has lost the consortium of his wife due to the injury from the BioZorb device. Plaintiff must wear a bra and still holds her breast to minimize pain from the device.

8.    The BioZorb is a Class II medical device cleared by the United States Food and Drug Administration ("FDA") in February 2012 pursuant to Section 510(k) of the Food and Drug, and Cosmetic Act ("510(k)"). BioZorb is a three-dimensional implantable radiographic marker. It is comprised of a bioabsorbable spacer that holds six radiopaque titanium clips. The bioabsorbable spacer material (polylactic acid) is intended to be resorbed in the body by hydrolysis, leaving the radiopaque clips as permanent indicators of the soft tissue site.

 

9.    The BioZorb's Instructions for Use ("IFU") (including all accompanying warnings), of which the same or substantially same applied to Plaintiff at the time of her implant, are illustrated below:

# BioZorb® Marker, BioZorb® LP Marker
## Instructions for Use

### DESCRIPTION

The Marker is a radiographic implantable marker used to mark soft tissue.

It is comprised of a bioabsorbable spacer that holds Titanium radiopaque marker clips. The bioabsorbable spacer material (poly lactic acid) is resorbed by the body leaving the radiopaque clips as a permanent indicator of the soft tissue site.

The Marker may be used with the following imaging modalities: X-Ray (CT, mammography), MR and ultrasound.

The bioabsorbable spacer is resorbed by a process of hydrolysis whereby the degradation products of the spacer material are metabolized by the body. The spacer material retains its functional integrity for approximately 2 months, while complete resorption may require up to one or more years.

### INDICATIONS

The Marker is indicated for radiographic marking of sites in soft tissue. In addition, the Marker is indicated in situations where the soft tissue site needs to be marked for future medical procedures.

### CONTRAINDICATIONS

The Marker should not be placed in a tissue site with clinical evidence of infection.

### WARNINGS

- The Marker should only be used by physicians trained in surgical techniques. The physician is responsible for its proper clinical use.
- The Marker is shipped sterile; do NOT re-sterilize any portion of the Marker.
- The Marker is for SINGLE USE only.
- Do NOT use if the package is open or damaged, or if the temperature indicator has a black center.
- Use the Marker prior to the expiry date shown on the product label.

### PLACEMENT OF MARKER

*PREPARATION*
1) Remove the Marker from the sterile packaging.
2) Visually inspect the product for any damage.

*INSERTION*
1) Using sterile technique, place the Marker in the desired tissue site.
2) Suture the marker to adjacent tissue at multiple locations as desired for secure positioning.
3) Where required, close the surgical cavity using standard surgical technique.

### DISPOSAL PROCEDURES

When necessary, dispose of any product in accordance with local regulations.

### STORAGE

Store at room temperature. Avoid storing the Marker at conditions of excessive heat or humidity. If the temperature indicator has a black center, do not use product. Handle with care. Packages should be stored in a manner that protects the integrity of the package and the sterile barrier.

### MRI SAFETY INFORMATION

Non-clinical testing has demonstrated the BioZorb® Marker / BioZorb® LP Marker is MR Conditional. A patient with this device can be safely scanned in an MR system under the following conditions:

- Static magnetic field of 1.5 T; Maximum spatial field gradient of 1,900 gauss/cm (19 T/m); Maximum MR system reported, whole body averaged specific absorption rate (SAR) of 2 W/kg (Normal Operating Mode); 15 minutes of continuous scanning

Under the scan conditions defined above in non-clinical testing, the Marker was shown to produce a maximum temperature rise of less than 1.6°C. In addition, the image artifact caused by the marker clip of the device extended an average of 3.8mm from the Marker when imaged with a gradient echo and spin echo pulse sequence and a 1.5T MRI system. MR image quality may be compromised if the area of interest is in the exact same area or relatively close to the position of the implant. Therefore, optimization of MR imaging parameters to compensate for the presence of this device may be necessary.

**HOLOGIC®**



Hologic, Inc.
250 Campus Drive.
Marlborough, MA 01752 USA.
Phone: 877-371-4372
BreastHealth.Support@hologic.com

10.    The FDA rejected clearing BioZorb for the indication that it provides a reference from which treatment (e.g. radiotherapy) can be guided.

11.    Hologic marketed BioZorb as a device that can fill space in breast tissue, improve cosmetic outcomes after procedures, and guide radiotherapy. The FDA did not clear any of these indications for use.

12.    The IFU for BioZorb contains no warnings or contraindications of any substance to effectively warn patients, physicians, or hospitals of the relevant risks associated with the use of the device.

13.    The BioZorb IFU and Defendant's marketing of the BioZorb indicate the device is intended to completely resorb in up to one or more years. However, there is evidence that the device can take significantly longer than one year to absorb, or it may fail to absorb at all. These risks are not mentioned in the IFU.

14.    Hologic was aware of Medical Device Reports ("MDRs") that reported patient complications including, but not limited to, infection, fluid buildup, device migration, device erosion, pain, discomfort, rash, extended resorption time of the device, and additional surgeries. These risks are not mentioned in BioZorb's IFU.

15.    Hologic also knew, or should have known, of clinical evidence that BioZorb can cause a hard, palpable lump causing patient pain and discomfort. These risks are not mentioned in BioZorb's IFU.

16.    Hologic also knew, or should have known, of clinical evidence that shows that BioZorb may increase a patient's radiation dose, contributing to further complications. As one breast surgery noted, "[n]ormally, a lumpectomy cavity is

treated for 5 fractions with low energy electrons such as 6 MeV or 9MeV. Such energies give modest doses to the skin and leave no permanent scarring. As you increase in energy electrons, it increases the skin dose, and you run the risk of seeing more early and late skin reactions. The most disfiguring side effect [of using the BioZorb device] is the appearance of telangiectasias, which look like red spider veins. These risks are not mentioned in BioZorb's IFU.

17.    Hologic also knew, or should have known, of clinical evidence that the device was causing infection, migration, necrosis, additional radiation, and additional surgery. These risks are not mentioned in BioZorb's IFU.

18.    On February 27, 2024, the U.S. Food and Drug Administration issued a Safety Communication ("February 27 Notice") regarding BioZorb Markers. The February 27 Notice informed patients, healthcare providers, and hospitals about the potential risk of serious complications when using BioZorb Markers manufactured by Hologic.

19.    The FDA issued the February 27 Notice after receiving reports describing complications (adverse events) with the use of BioZorb Markers in breast tissue including infection, fluid buildup (seroma), device moving out of position (migration), device breaking through the skin (erosion), pain, discomfort from feeling the device in the breast, rash, other complications "possibly associated with" extended resorption time (resorbable component of the device not resorbing in the patient's body for several years), and the need for additional medical treatment to remove the device.

20.    The FDA noted in the February 27 Notice that it had cleared BioZorb Markers for radiographic marking of sites in soft tissue (including breast) or for marking the soft tissue site for future medical procedures.

21.    In the February 27 Notice, the FDA stated that it had not cleared or approved the BioZorb Markers to fill space in the tissue or to improve cosmetic outcomes after procedures.

22.    From its entry into the market, Defendant marketed and promoted the BioZorb Markers to hospitals and surgeons as a device that fills space in breast tissue and improves cosmetic outcomes following surgery.

23.    Hospitals relied on Defendant's representations and allowed use of BioZorb Markers in patients, including Plaintiff.

24.    The FDA noted that Defendant had not provided any data to support its claim that the device improved cosmetic outcomes.

25.    On March 13, 2024, pursuant to FDA direction, Hologic sent an Important Medical Device Safety Notification ("Safety Notification") to affected customers.

26.    The Safety Notification was to request that patients contact their healthcare provider if they experience any adverse events following the placement of a BioZorb Marker; report any problems or complications experienced following the placement of the BioZorb Marker devices to Hologic and to the FDA's MedWatch Adverse Event Reporting program; and discuss the benefits and possible risks of

implantable breast tissue markers for breast cancer procedures with their health care provider.

27.     The Important Medical Device Safety Notification was also required to be sent to healthcare providers, and Hologic requested that the healthcare providers be aware of serious adverse events following possible risks of BioZorb Marker devices with each patient; inform all patients on which device will be used if a marking device will be used during breast conservation surgery; continue to monitor patients who have an implanted BioZorb Marker for signs of any adverse events; and report any problems or complications experienced by patients following placement of the BioZorb Marker devices to Hologic and the FDA's MedWatch Adverse Event Reporting program.

28.     On May 22, 2024, the FDA classified Hologic's communications to its customers as a Class I recall, the most serious type of recall. When Plaintiff learned of the recall, she discovered her cause of action against Hologic. Therefore, this case was filed timely pursuant to Tenn. Code Ann. §§ 29-28-103, 104 and Tennessee's discovery rule.

29.     The FDA further noted that the use of BioZorb Markers may cause serious injuries or death. The FDA indicated that this recall was a correction, not a product removal.

30.     Complaints that led to the recall included reports of pain, infection, rash, device migration, device erosion, seroma, discomfort, or other complications from

feeling the device in the breast, and the need for additional medical treatment to remove the device.

## COUNT I – STRICT LIABILITY / FAILURE TO WARN

31.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

32.    At all relevant times, Defendant designed, tested, manufactured, marketed, labeled, distributed, and sold the BioZorb device.

33.    Defendant expected that, and the BioZorb was indeed, sold and implanted in Plaintiff without a substantial change in condition.

34.    Defendant sold the BioZorb in a defective condition in that it contained inadequate warnings regarding the unreasonably dangerous condition of the BioZorb.

35.    Defendant knew and intended for the BioZorb device to be implanted into individuals for whom the device is indicated, including Plaintiff.

36.    Defendant had a duty to produce a product that contained adequate warnings and had a duty to disclose the dangers and risks of the BioZorb device, which Defendant knew, or in the exercise of ordinary care, should have known, at the time the BioZorb device left their control.

37.    Defendant knew, or in the exercise of ordinary care, should have known that the BioZorb device could cause the injuries suffered by Plaintiff because Defendant was aware of post- marketing adverse event reports, otherwise known as Medical Device Reports ("MDRs"), that alleged the same or substantially similar injuries that were suffered by the Plaintiff in this lawsuit.

38.    Moreover, Defendant was aware that BioZorb was designed in such a way that, following implant, it would perform in the recipient's body in a way that was not consistent with what Defendant stated in the product's instructions for use, and in a way that posed an unreasonably dangerous risk profile for patients.

39.    The BioZorb device was not accompanied by proper warnings and instructions to physicians and the public regarding potential adverse side effects associated with the implantation of the device and the comparative severity and duration of such adverse side effects.

40.    Specifically, the BioZorb's IFU (Instructions for Use) failed to include warnings that the BioZorb device may take several years to (and in some cases, may never) dissolve in the breast and need to be surgically removed. The warnings also failed to include information that a radiologist might need to use a higher energy electron therapy which can cause scarring on the breast.

41.    The IFU also failed to adequately warn that the BioZorb is associated with chronic and/or serious adverse effects, including chronic and/or severe pain, infection, rash, device migration, device erosion, seromas, chronic discomfort, feeling of a lump in the breast (lack of resorbed device), and other complications related to lack of absorption of the device in the breast.

42.    The IFU also failed to warn that the adverse effects pose a significant risk of subsequent surgical treatment to remove the device and/or otherwise pose a risk of clinically significant sequelae including mass formation, infectious buildup,

scarring, fat necrosis, adverse tissue reaction, and extrusion of the device from breast skin and tissue.

43.     The above clinically significant issues and their association with the BioZorb device were known or knowable by the Defendant at the time the device was implanted into Plaintiff, which necessitated warnings, but Defendant failed to place such warnings in the IFU.

44.     Had Plaintiff been warned of the serious adverse effects, she would not have chosen to receive the BioZorb device and would have worked in conjunction with her implanting physician to receive an alternative treatment and/or device.

45.     Defendant also marketed BioZorb in a manner beyond its indications for use, for example, to fill space in breast tissue and/or improve cosmetic outcomes after procedures and participated in other "off label" promotional activities.

46.     Defendant's sales representatives used "off label" promotional activities while also with failing to disclose to physicians the risks of BioZorb, which caused physicians, including Plaintiff's physician, to recommend to Plaintiff the BioZorb device while also holding an incomplete or otherwise inaccurate perception of its risk/benefit analysis.

47.     Had Defendant disclosed the true risks of the BioZorb device to Plaintiff's physician, then this would have altered Plaintiff's implanting physician's risk/benefit analysis and would have caused Plaintiff's implanting physician to recommend an alternative treatment and/or device and/or would have caused Plaintiff to elect an alternative device.

48.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT II – STRICT LIABILITY / DESIGN DEFECT

49.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

50.    At all relevant times, Defendant designed, researched, developed, inspected, tested, packaged, labeled, distributed, supplied, and/or sold BioZorb.

51.    Defendant expected that, and the BioZorb was indeed, sold and implanted in Plaintiff without a substantial change in condition.

52.    The design of the BioZorb is defective and unreasonably dangerous because of its design aspects, including, but not limited to, its shape, surface, texture, material, and integration of parts. The design aspects of the BioZorb could have been feasibly changed to make the device less harmful and not unreasonably dangerous.

53.    There are technologically feasible and practical alternative designs that would have reduced or prevented Plaintiff's harm.

54.    In the oncological surgical market, alternative designs exist that are mechanically feasible, safer, and cost significantly less than BioZorb.

55.    For example, titanium clips that have been on the market for years carry less clinical risk to the patient. In fact, at least one clinical study has found that the use of clips to mark a cancer patient's tumor bed is more cost effective and advantageous than the use of BioZorb.

56.     The BioZorb's design poses a high gravity of danger, beyond that of the reasonable consumer's contemplation. The risks of the design of BioZorb device outweigh the benefits of its design aspects. For example, if the BioZorb does not fully absorb in the body after 1 year or more, which is a common adverse occurrence which is not warned about in the IFU, it poses an unreasonable risk of migration, infection, chronic seroma and/or fluid buildup, chronic pain, and/or the device becomes a chronic "mass" that must be surgically removed.

57.     The design of the BioZorb device was a substantial factor in causing harm to Plaintiff.

**COUNT III – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

58.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as is fully set forth herein.

59.     Defendant designed, researched, developed, inspected, tested, packaged, labeled, distributed, supplied, and/or sold BioZorb with an implicit warranty that the BioZorb was fit for the ordinary purpose for which it was used, and, in Plaintiff's case, the use in which the BioZorb was warrantied was to be used as a radiation marker following breast cancer lumpectomy.

60.     Defendant impliedly warranted to prospective purchasers and users, including Plaintiff, that the BioZorb device was safe, merchantable, and fit for the ordinary purposes for which said product was to be used.

61.    Plaintiff reasonably relied upon the skill and judgement of Defendant as to whether the BioZorb device was of merchantable quality and safe and fit for its intended use.

62.    Upon information and belief, and contrary to such implied warrants, the BioZorb device was not of merchantable quality or safe and fit for its intended use, because the product was and is unreasonably dangerous and unfit for the ordinary purposes for which it was used, as described above.

63.    Further, Restatement (Second) of Torts Section 402A, comment "k", does not bar the Plaintiff's breach of implied warranty claim based on the Defendant's presumed position that the medical device at issue was unavoidably unsafe.

64.    Defendant marketed BioZorb to fill space in breast tissue, to improve cosmetic outcomes after procedures, and to provide radiotherapy guidance, all in direct contravention of the Indications for Use cleared by the FDA.

65.    Defendant marketed BioZorb to fill space in the breast tissue, improve cosmetic outcomes after procedures, or to provide radiotherapy guidance, all in contravention of the Indications for Use cleared by the FDA, of which Defendant knew or should have known.

66.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

**COUNT IV – NEGLIGENCE**

67.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

68.    At all times material hereto, Defendant, directly or indirectly, created, manufactured, assembled, designed, sterilized, tested, packaged, labeled, marketed, promoted advertised, sold and/or distributed into the stream of commerce the BioZorb device including the one implanted in Plaintiff.

69.    Under federal and state law and regulation, Defendant was under a continuing duty to test and monitor the BioZorb device as well as their component parts, design, and manufacturing processes after premarket approval. The duties included establishing and validating its quality control systems and product suppliers, testing the device design, and investigating and reporting to the FDA any complaints about the device's performance and any malfunctions of which Defendant became aware and that are or may be attributable to the BioZorb device. See 21 C.F.R. Part 803; 21 C.F.R. Part 814; 21 C.F.R. Part 820; 21 U.S.C. §§ 351(h), 360i.

70.    Defendant was negligent in designing, manufacturing, researching, developing, preparing, processing, packaging, promoting, marketing, labeling, supplying, inspecting, testing, distributing, and selling the BioZorb by failing to use reasonable care in fulfilling their duty to avoid foreseeable dangers.

71.    Defendant was negligent in failing to comply with federal and state law and failing to use reasonable care in fulfilling their duty to inform users of dangerous risks, including risks posed by the device's negligent design. As a result of the

foregoing conduct, Plaintiff's physicians, and hospitals were sold defective medical devices without knowing the true risk-benefit ration of the BioZorb.

72.    Defendant knew or should have known that the risk of the BioZorb was different than what was in the IFU and communicated to patients, physicians, and hospitals.

73.    Defendant knew or should have known that the BioZorb's benefits differed from what was marketed, promoted, advertised, and communicated to patients, physicians, hospitals, and the general public.

74.    Defendant knew or should have known that the FDA did not clear the BioZorb marker to fill space in the breast tissue, improve cosmetic outcomes after procedures, or provide radiotherapy guidance.

75.    Despite this knowledge, Defendant marketed the BioZorb to fill space in breast tissue, to improve cosmetic outcomes after procedures, and to provide radiotherapy guidance, all in direct contravention of the Indications for Use cleared by the FDA.

76.    It was reasonably foreseeable to Defendant that Plaintiff and other consumers would be harmed because of Defendant's failure to exercise ordinary care and failure to report material information regarding the device's risks and claimed benefits. Defendant knew that Plaintiff and her physician and hospitals would use the medical device for its intended purpose, that their intended use would pose a substantial health risk to Plaintiff, and that Plaintiff, and the medical community would rely on Defendant's representations and omissions regarding the safety and

performance of its products in deciding whether to purchase and/or implant the BioZorb.

77.    Under the same or similar circumstances, a reasonable manufacturer would have warned through an appropriate channel and medium of communication of the danger and reported the risks of BioZorb to patients, physicians, and hospitals.

78.    Had Defendant adequately tested BioZorb, evidence regarding the device's risks, the rate of occurrence, and the extent of harm regarding each risk would have been found and could have been communicated to patients, physicians, and hospitals.

79.    Had Defendant employed safety monitoring and pharmacovigilance measures for BioZorb, it could have mitigated or eliminated the risks posed by the BioZorb.

80.    Had Defendant timely reported the known risks associated with the BioZorb to patients, physicians, and hospitals and allowed them to make informed decisions about using an alternative product that did not present the same risks, or foregoing the use of any marker, Plaintiff would not have been implanted with BioZorb.

81.    Defendant knew that BioZorb's design was defective yet failed to take reasonable measures to mitigate or eliminate the risks posed by the defective design.

82.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff suffered injuries, including but not limited to physical pain, infection, subsequent surgeries, and emotional injuries. As a result of the above negligence,

Plaintiff suffered pain, medical expenses, emotional distress, and other economic and non-economic damages.

## COUNT V – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

83.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

84.    At all relevant times, Defendant was in the business of designing, manufacturing, testing, labeling, marketing, and selling the BioZorb device for implantation in patients, including Plaintiff.

85.    Defendant, through its agents and sales representatives, marketed the BioZorb device to physicians, hospitals, and patients, including Plaintiff's implanting surgeon, for the particular purposes of (a) improving cosmetic outcomes following lumpectomy; (b) providing guidance for radiotherapy; and (c) filling the space left by tumor excision.

86.    Plaintiff and her treating physicians relied upon Defendant's skill, expertise, and representations that the BioZorb was suitable for those particular purposes.

87.    Defendant knew or had reason to know at the time of sale that Plaintiff and her physician were relying on Defendant's skill and judgment to furnish a product suitable for those particular purposes.

88.    The BioZorb device was not fit for those particular purposes because:

- The FDA had not cleared the device for those uses.

- Defendant failed to disclose known risks such as device migration, erosion, non-absorption, pain, infection, and scarring.

- Defendant failed to support its marketing claims with adequate scientific data; and

- The device's actual performance was inconsistent with its intended and marketed purpose.

89.    The failure of the device to function as marketed and intended has caused Plaintiff physical harm, emotional distress, and economic loss.

90.    Defendant's breach of the implied warranty of fitness for a particular purpose was a direct and proximate cause of Plaintiff's injuries and damages.

91.    As a result, Plaintiff has suffered and will continue to suffer physical pain, permanent injury, emotional distress, loss of consortium, and economic damages, including medical expenses and loss of enjoyment of life.

## COUNT VI – PUNITIVE DAMAGES

92.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

93.    Defendant Hologic, Inc. acted recklessly, intentionally, and with conscious disregard for the safety and well-being of patients, including Plaintiff, in its development, marketing, labeling, and distribution of the BioZorb device.

94.    Hologic marketed the BioZorb device for uses that had not been approved or cleared by the FDA, including improving cosmetic outcomes and serving as a radiotherapy guide, despite the FDA explicitly rejecting such indications.

95.    Defendant failed to disclose serious and well-documented risks of the device—such as pain, migration, erosion, infection, scarring, and non-resorption—despite receiving numerous Medical Device Reports (MDRs) and having access to clinical evidence identifying these complications.

96.    Defendant continued its aggressive marketing and sales strategies through agents and representatives who promoted the device using these unapproved and misleading claims, even after being aware of multiple adverse events and complications experienced by patients, including Plaintiff.

97.    Defendant's management authorized, ratified, or approved the acts and omissions referenced above with knowledge of or reckless disregard for the likelihood that such acts or omissions would result in significant injury or harm.

98.    In addition, Hologic's management was reckless in the hiring, training, supervision, and retention of employees and sales representatives who engaged in the off-label promotion and failure to disclose risks, in direct violation of patient safety and regulatory obligations.

99.    Management at Hologic was aware of but consciously disregarded a substantial and unjustifiable risk of injury such that its disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

100.   The misconduct was committed by employees who were in a management capacity while they acted within the scope of employment with Hologic.

101.   Such corporate misconduct rises to the level of reckless disregard under Tennessee law, entitling Plaintiffs to an award of punitive damages pursuant to Tenn. Code Ann. § 29-39-104.

WHEREFORE, Plaintiffs respectfully pray for judgment against the Defendant as follows:

A.   Compensatory damages in such amounts set by the jury,

B.   Punitive damages in an amount set by the jury,

C.   Pre-judgment interest and post-judgment interest, and

D.   All further relief the Court may deem just and proper.

Respectfully submitted,

Respectfully submitted,
**THE KELLY FIRM**

F. Dulin Kelly, BPR No. 04085
Clinton L. Kelly, BPR No. 16171
629 East Main Street
Hendersonville, TN 37075
Phone: (615) 800-0000
dulin@kellyfirm.net
clint@kellyfirm.net
*Counsel for Plaintiffs*